## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RONALD J. LASKY, Derivatively on Behalf of Nominal Defendant SAVARA INC., <br><br> Plaintiff, <br><br> v. <br><br> MATTHEW PAULS, DAVID LOWRANCE, NEVAN ELAM, RICHARD J. HAWKINS, AN VAN ES-JOHANSSON, JOSEPH S. MCCRACKEN, and DAVID A. RAMSAY, <br><br> Defendants, <br><br> and <br><br> SAVARA INC., <br><br> Nominal Defendant. | Case No. _____ <br><br><br> **JURY TRIAL DEMANDED** |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Ronald J. Lasky ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Savara Inc. ("Savara" or the "Company"), against certain current and former executive officers and members of the Company's Board of Directors (the "Board") seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published

by and regarding Savara, legal filings, news reports, securities analysts' reports about the Company, filings in the related securities class action captioned *Ho v. Savara Inc., et al.*, No. 2:25-cv-05147 (E.D. Pa.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by Plaintiff on behalf of Savara against certain of its current and former officers and members of the Company's Board (collectively, the "Individual Defendants")[1] for breaches of their fiduciary duties between at least March 7, 2024, and May 23, 2025, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2.      Savara is a clinical stage biopharmaceutical company based in Pennsylvania that is focused on rare respiratory diseases. Savara's primary product candidate is molgramostim inhalation solution ("MOLBREEVI" or "molgramostim"). MOLBREEVI is an investigational inhaled granulocyte-macrophage colony-stimulating factor ("GM-CSF") for autoimmune pulmonary alveolar proteinosis ("aPAP"), which is a chronic debilitating rare lung disease characterized by the abnormal buildup of surfactant in the alveoli of the lungs. This buildup blocks the production of GM-CSF, well-characterized specific glycoproteins that interact to control production, differentiation, and function of certain white blood cells. If GM-CSF production is blocked, patients experience problems getting oxygen into the body which can lead to shortness of breath, fatigue, and chronic cough.

---

[1] The "Individual Defendants" are Matthew Pauls ("Pauls"), David Lowrance ("Lowrance"), Nevan Elam ("Elam"), Richard J. Hawkins ("Hawkins"), An van Es-Johansson ("van Es-Johansson"), Joseph S. McCracken ("McCracken"), and David A. Ramsay ("Ramsay"). "Defendants" means Savara and the Individual Defendants.

3.     Before, and during, the Relevant Period, MOLBREEVI was in Phase III clinical trials to get nationwide commercial approval for MOLBREEVI from the U.S. Food and Drug Administration ("FDA"). In December 2024, the Company sought a biologics license application ("BLA") from the FDA for MOLBREEVI given its results from the Phase III trial. To complete a BLA, Savara needed to submit, among other things, information regarding the candidate drug's chemistry, manufacturing, and controls ("CMC") in the BLA to the FDA. Typically, companies wishing to comply with the CMC requirements of the BLA must provide a detailed account of the candidate drug's manufacturing process, including stability testing, quality control procedures, and the analytical method used to validate the drugs safety and usability.

4.     However, during the Relevant Period, the Individual Defendants made, or caused the Company to make, materially false and misleading statements to shareholders regarding MOLBREEVI and the time it would take to secure a BLA from the FDA.

5.     For example, on December 18, 2024, Savara issued a press release announcing the submission of the BLA for MOLBREEVI to the FDA (the "BLA Press Release"), quoting Defendant Pauls who said "Given the positive results of the pivotal, Phase 3 IMPALA-2 trial, we believe MOLBREEVI demonstrates a favorable benefit-risk profile and could fundamentally change the way aPAP is treated."[2] The BLA Press Release also provided shareholders a timeline of when BLA was expected to be completed, stating "[the Company was] expect[ed] to complete the submission of the rolling BLA by the end of 1Q 2025."

---

[2] Press Release, Savara Inc., Savara Initiates Rolling Submission of a Biologics License Application (BLA) to the U.S. Food and Drug Administration (FDA) for MOLBREEVI* for the Potential Treatment of Autoimmune Pulmonary Alveolar Proteinosis (aPAP) (Dec. 18, 2024), https://investors.savarapharma.com/news/news-details/2024/Savara-Initiates-Rolling-Submission-of-a-Biologics-License-Application-BLA-to-the-U-S--Food-and-Drug-Administration-FDA-for-MOLBREEVI-for-the-Potential-Treatment-of-Autoimmune-Pulmonary-Alveolar-Proteinosis-aPAP-12-18-2024/default.aspx

6.      On May 13, 2025, the Company issued a press release reporting its financial results for the first quarter of fiscal year 2025 (the "1Q25 Press Release"). The 1Q25 Press Release provided a renewed timeline for the approval of MOLBREEVI, quoting Defendant Pauls who stated, in relevant part:

> At the end of 1Q 2025, we announced the on-time submission of the MOLBREEVI BLA to the FDA for the treatment of autoimmune PAP and requested priority review . . . . If Priority Review is granted, we anticipate a PDUFA date by the end of the year and are preparing for a U.S. commercial launch in early 2026. We are also on track to submit the MAA in both Europe and the U.K. by the end of the year. Lastly, with approximately $172.5 million in cash, and the optionality to further finance the company through access to low-cost capital from our recent debt financing, we are in a strong financial position and believe our current cash runway extends into 2H 2027, well beyond a U.S. launch.

7.      However, the FDA did not approve Savara's BLA. Instead, the FDA issued a refusal to file ("RTF") letter to the Company. On May 27, 2025, Savara revealed the RTF to shareholders and the public in a press release (the "RTF Press Release"). In the RTF Press Release, Savara indicated that the FDA believed the Company's BLA for MOLBREEVI was incomplete and would not move forward with its approval. The RTF Press Release discussed the FDA's determination to not proceed with MOLBREEVI's BLA approval, stating, in relevant part:

> Savara Inc. . . . today announced that the Company received an RTF letter from the FDA for the BLA of MOLBREEVI as a therapy to treat patients with autoimmune PAP.
>
> Upon preliminary review, the FDA determined that the BLA submitted in March 2025 was not sufficiently complete to permit substantive review and requested additional data related to Chemistry, Manufacturing, and Controls (CMC). The RTF was not the result of safety concerns, and the FDA did not request or recommend additional efficacy studies. Within the next 30 days, the Company intends to request a Type A meeting with the Agency. Typically, Type A meetings are granted by the FDA within 30 days of the request.[3]

---

[3] Press Release, Savara Inc., Savara Receives Refusal to File (RTF) Letter from the U.S. Food and Drug Administration (FDA) for the Biologics License Application (BLA) for MOLBREEVI* to Treat Patients With Autoimmune Pulmonary Alveolar Proteinosis (autoimmune PAP) (May 27, 2025),  https://investors.savarapharma.com/news/news-details/2025/Savara-Receives-Refusal-to-

8.     On this news, the Company's stock price declined $0.90 per share, or approximately 31.7%, from a close at $2.84 per share on May 23, 2025, to close at $1.94 per share on May 27, 2025, on high trading volume.

9.     As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public.  Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) the BLA for MOLBREEVI lacked the necessary CMC information to complete the BLA; (ii) as a result of the incomplete CMC information, the FDA was unlikely to approve the BLA for MOLBREEVI; (iii) the timeframe in which the Individual Defendants represented to shareholders that the BLA for MOLBREEVI would be approved was unrealistic; (iv) due to the delay in the approval of the BLA for MOLBREEVI, there was an increased likelihood that the Company would need to raise additional capital; (v) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval for agendas in the 2024 Proxy, including, but not limited to, the 2024 Omnibus Incentive Plan; (vi) the Company did not have effective risk oversight mechanisms and controls in place; and (vii) as a result of the foregoing, the Company's public statements regarding its business, operations, and financial prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

10.     Furthermore, Individual Defendants willfully or recklessly failed to maintain adequate internal controls to prevent improper insider trading during the Relevant Period, leading

---

File-RTF-Letter-From-the-U-S--Food-and-Drug-Administration-FDA-for-the-Biologics-License-Application-BLA-for-MOLBREEVI-to-Treat-Patients-With-Autoimmune-Pulmonary-Alveolar-Proteinosis-autoimmune-PAP/default.aspx

to the improper sale of the Company's stock by certain Individual Defendants when the Company's stock was artificially inflated.

11.     As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Pauls and Lowrance on September 8, 2025, in the United States District Court for the Eastern District of Pennsylvania.

12.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

13.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Savara' Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a)) and SEC Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R.§240.14a-9).

15.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18.    In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

19.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Savara maintains its principal executive offices in this District, Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## PARTIES

*Plaintiff*

20.    Plaintiff is, and has been at all relevant times, a continuous shareholder of Savara.

*Nominal Defendant*

21.    Nominal Defendant Savara is a Delaware corporation with its principal executive offices located at 1717 Langhorne Newton Road, Suite 300, Langhorne, Pennsylvania.  Savara's common stock trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "SVRA."

*Individual Defendants*

22.     Defendant Pauls has served as the Company's Chief Executive Officer ("CEO") since December 2020, the Chair of the Board since September 2020, and as a director of the Company since April 2017. According to the Company's proxy statement filed on a Schedule 14A with the SEC on April 25, 2025 (the "2025 Proxy"), Defendant Pauls received $4,912,011 in total compensation from the Company in 2024.

23.     Defendant Lowrance has served as the Company's Chief Financial Officer ("CFO") of the Company since December 2025. According to the 2025 Proxy, Defendant Lowrance received $1,878,628 in total compensation from the Company in 2024.

24.     Defendant Elam has served as a director of the Company since February 2009. Elam also serves as Chair of the Company's Compensation Committee and as a member of the Company's Nominating & Governance Committee. According to the 2025 Proxy, Defendant Elam received $191,500 in total compensation from the Company in 2024.

25.     Defendant Hawkins has served as a director of the Company since October 2010. Hawkins also serves as a member of the Company's Audit Committee. According to the 2025 Proxy, Defendant Hawkins received $183,000 in total compensation from the Company in 2024.

26.     Defendant van Es-Johansson has served as a director of the Company since December 2019. Defendant van Es-Johansson also serves as a member of both the Company's Audit Committee and the Company's Compensation Committee. According to the 2025 Proxy, Defendant van Es-Johansson received $189,500 in total compensation from the Company in 2024.

27.     Defendant McCracken has served as a director of the Company since December 2019. McCracken also serves as Chair of the Company's Nominating & Governance Committee, and as a member of the Company's Compensation Committee. According to the 2025 Proxy,

Defendant McCracken received $196,500 in total compensation from the Company in 2024.

28.    Defendant Ramsay has served as a director of the Company since April 2017. Ramsay also serves as Chair of the Company's Audit Committee, and as a member of the Company's Nominating & Governance Committee. According to the 2025 Proxy, Defendant Ramsay received $194,250 in total compensation from the Company in 2024.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

29.    By reason of their positions as officers and/or directors of Savara, and because of their ability to control the business and corporate affairs of Savara, the Individual Defendants owed Savara and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Savara in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Savara and its shareholders.

30.    Each director and officer of the Company owes to Savara and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

31.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Savara, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32.    To discharge their duties, the officers and directors of Savara were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

33.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good

faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Savara, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

34.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

35.    To discharge their duties, the officers and directors of Savara were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Savara were required to, among other things:

(i)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Pennsylvania and the United States, and

pursuant to Savara' own Code of Business Conduct and Ethics (the "Code of Conduct");

(ii)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)    Remain informed as to how Savara conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Savara and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Savara' operations would comply with all applicable laws and Savara' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

36.    Each of the Individual Defendants further owed to Savara and the shareholders the duty of loyalty requiring that each favor Savara' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

37.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Savara and were at all times acting within the course and scope of such agency.

38.    Because of their advisory, executive, managerial, and directorial positions with Savara, each of the Individual Defendants had access to adverse, non-public information about the Company.

39.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Savara.

## <u>SAVARA'S CODE OF CONDUCT</u>

40.    The Company's Code of Conduct applies to all of Savara's employees, officers, and directors.

41.    In a letter addressed to "Employees, Officers and Directors of Savara Inc.," included at the beginning of the Company's Code of Conduct, it states that "[Savara] is committed to honesty and accountability as the cornerstones of the way it does business and expects all employees, officers and directors of the Company to conduct all Company business in an ethical and legal manner."

42.    Under a section titled "Introduction – General Statement of Company Policy," the Code of Conduct states, in relevant part:

This Code of Business Conduct and Ethics (this "Code") covers a wide range of business practices, procedures and principles of behavior that support the commitment of Savara Inc. and its subsidiaries (collectively, the "Company") to conduct business within the confines of applicable law and by high ethical standards. The Company expects every employee, officer and director to read and understand this Code and abide by it in performance of his or her business responsibilities. Employees are also expected to seek to have all agents and contractors conform to Code standards when working for or on behalf of the Company . . . .

Your personal integrity and good judgment are essential to ensuring the Company conducts its business in a lawful and ethical manner at all times. In general, the Company expects you to:

- comply with applicable laws, rules, and regulations;
- conduct all dealings with the Company's vendors, collaborators, suppliers, customers and competitors fairly, with honesty and integrity;
- avoid actual and foreseeable conflicts of interest with the Company;
- produce or support others in producing full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to the Securities and Exchange Commission (the "SEC") and in other public communications;
- protect information, in any form, that belongs to the Company, its vendors, collaborators, suppliers, customers and competitors consistent with contractual obligations and professional standards;
- protect the Company's assets and ensure their efficient use and report any suspected fraud or theft immediately; and
- never use your position with the Company or Company assets or information for improper personal gain . . . .

If you violate this Code, you will be subject to disciplinary action, up to and including immediate termination of your employment or other relationship with the Company.

43.    Under a section titled "Lawful and Ethical Behavior," the Code of Conduct states,

in relevant part:

Obeying the law, both in letter and in spirit, is the foundation on which this Code is built. The Company expects you to respect and conduct business in accordance with applicable laws of the cities, states and countries in which the Company operates. Although you are not expected to know the details of these laws, it is important to know enough to determine when to seek advice from supervisors or the Compliance Officer. In addition, the Company's policy demands that you adhere to high standards of business ethics and conduct . . . .

If you remain uncertain about what to do, if you need advice, or if you have reason to believe that a domestic or foreign law could be violated in connection with Company business or that this Code has been violated in any way, report your concern immediately pursuant to the procedures described in Section 17 below.

44.    Under a section titled "Code of Ethics," the Code of Conduct states:

This Code of Ethics is promulgated by the Company's Board of Directors (the "Board") under section 406 of the Sarbanes Oxley Act of 2002 and the related rules of the SEC and applies to all employees, officers and directors and of the Company. It contains standards reasonably necessary to promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by the issuer and in other public communications; and compliance with applicable governmental laws, rules and regulations. It should be read in conjunction with the rest of this Code.

You must:

- Act with honesty and integrity, ethically handling actual or apparent conflicts of interest in personal and professional relationships. You should recognize that even the appearance of a conflict of interest can damage the Company. A conflict of interest may exist because of a relationship of yours or of a family member that is inconsistent with the Company's best interests or could cause a conflict with your ability to perform your job responsibilities.
- Report to the Compliance Officer any transaction that reasonably could be expected to give rise to a conflict of interest.
- Produce, or cause to produced, full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to the SEC and in other public communications.
- Comply with applicable governmental laws, rules and regulations.
- Promptly report any violation of this Code of Ethics to the Compliance Officer.
- Proactively promote ethical behavior by other Company officers and employees involved in financial reporting.

The Company reserves the right to determine when actual or potential conflicts of interest exist, and then to take any action, which in the sole judgment of the Company, is needed to prevent the conflict from continuing.

You will be held accountable for your adherence to this Code of Ethics. Your failure to observe the terms of this Code of Ethics may result in disciplinary action, up to and including immediate termination of your employment.

Any request by you for a waiver of any provision of this Code of Ethics must be in writing and addressed to the Compliance Officer, unless you are a senior financial

officer (the Company's principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions are "senior financial officers" for purposes of this Code of Ethics), other executive officer or director, in which case it must be addressed to the Chair of the Audit Committee.

With regard to senior financial officers, other executive officers and directors, the Board will have the sole and absolute discretionary authority, acting upon such recommendation as may be made by the Audit Committee, to approve any waiver with respect to this Code of Ethics. Any waiver for senior financial officers, other executive officers or directors with respect to this Code of Ethics will be disclosed promptly on Form 8-K or any other means that complies with SEC rules or applicable securities exchange listing standards.

45.     Under a section titled "Accurate and Timely Books and Records," the Code of

Conduct states, in relevant part:

The Company requires that its corporate and business records be completed accurately and in a timely manner. The integrity of the Company's financial statements and public disclosure depends on the accuracy and completeness of all supporting financial information, including the Company's books of account. The making of false or misleading entries, whether they relate to financial results or otherwise, is both illegal and unethical. You must act in a manner that helps to ensure all of the Company's books, records, accounts and financial statements are maintained in reasonable detail, appropriately reflect the Company's transactions, and conform both to applicable legal requirements and to the Company's system of internal controls. You must execute and record transactions in accordance with all of the Company's internal control procedures. All of your expense reimbursements must accurately reflect the true nature and amount of the expenses. No entry may be made in the Company's books and records that intentionally hides or disguises the nature of any transaction or liability of the Company or misclassifies any transactions as to accounts or accounting periods. No cash or other assets may be maintained for any purpose in any unrecorded or "off-the-books" fund.

If you are in any way involved in preparing or verifying reports that the Company files with or submits to the SEC or other public communications (such as press releases), you must help to ensure that such reports and other documents provide full, fair, accurate, timely and understandable disclosure and fairly present the Company's financial condition and results of operations.

It is very important that you do not create or perpetuate, or participate in the creation or perpetuation of, any records that are intended to mislead anyone or conceal any improper act or conduct.

If you become aware of any departure from these standards, you have a responsibility to report it immediately pursuant to the procedures described in Section 17 below.

46.    Under a section titled "Conflicts of Interest," the Code of Conduct states:

The Company respects the rights of its employees, officers and directors to manage their personal affairs and investments and does not wish to impinge on their personal lives. At the same time, you should avoid business or financial interests and personal activities that may give rise to a conflict of interest. A "conflict of interest" occurs when an individual's personal interests interfere in any way with the interests of the Company. A conflict of interest can arise whenever you, as an employee, officer or director, take action or have an interest that may make it difficult to perform your Company responsibilities objectively and effectively. Conflicts of interest also arise when you or a member of your family receive an improper personal benefit as a result of your position in the Company. The basic factor in all conflicts of interest situations is the division of loyalty between the Company's interests and your personal interests. Even the appearance of a conflict of interest where none actually exists can be damaging to you and/or the Company and should be avoided . . . .

While it is not possible to identify every activity or relationship that is, or may result in, a conflict of interest, or the appearance of one, if you or your family members are engaged in any of the activities listed below, then there may be a conflict of interest, and you must disclose the facts concerning the activity or relationship (as described above) in order to have the Company address the situation:

- any employment or consulting relationship with, or any service on the board of directors or any advisory board of, any entity that does business, seeks to do business or competes with the Company;
- any ownership interest in any entity that does business, seeks to do business or competes with the Company (other than nominal amounts of securities in publicly traded companies and ownership interests resulting from ownership interests in mutual funds);
- any activity that harms or interferes with a relationship or potential relationship between the Company and any entity with which the Company does business or seeks to do business;
- any business activity that is competitive with the Company's business;
- any outside employment, consulting or other activity of any type that calls into question your ability to devote appropriate time and attention to your duties and responsibilities to the Company;
- any direct supervisory, review or other influential position on the job evaluation, pay or benefits of any close relative;
- any sales or purchases of anything to or from the Company (unless it is pursuant to a routine program that is offered to all employees in general); and

- any situation in which, without proper authorization, you are required or tempted to disclose, or do disclose, any trade secret, confidential or proprietary information or intellectual property of the Company.

The Company reserves the right to determine when actual or potential conflicts of interest exist, and then to take any action, which in the sole judgment of the Company, is needed to prevent the conflict from continuing. Such action may include, but is not limited to, having you discontinue the conflicting activity or relationship, divest the conflicting interest and/or return the benefit or gain received, to realign your duties and responsibilities, or disciplinary action, up to and including immediate termination of your employment.

47.    Under a section titled "Compliance Procedures; Reporting Violations," the Code of

Conduct states:

Communication of this Code; Monitoring Compliance

The Company will monitor compliance with this Code under the supervision of the Audit Committee and Compliance Officer and, when appropriate, impose and enforce appropriate disciplinary measures for violations of this Code. You are required to cooperate fully with any audits for compliance with this Code and to provide truthful and accurate responses to any request. Any failure to provide such cooperation or responses will result in disciplinary action, up to and including termination of your relationship with the Company.

## SAVARA' AUDIT COMMITTEE CHARTER

48.    Savara' Audit Committee Charter states that:

The primary purpose of the Audit Committee (the "Committee") of the board of directors (the "Board") of Savara Inc. (the "Company") is to oversee the accounting and financial reporting processes of the Company, including its internal controls system, and audits of its financial statements. Notwithstanding the foregoing, however, the Committee is not responsible for planning or conducting audits, determining whether the Company's financial statements are complete and accurate or in accordance with generally accepted accounting principles, or determining whether the Company's internal control over financial reporting is effective.

49.    Under a section titled "Responsibilities," the Audit Committee Charter states that

Savara' Audit Committee has the following duties and responsibilities, among others:

6. Meet with management and the independent auditor, together and separately, to discuss the annual financial statements and the report of the independent auditor

thereon, and to discuss significant issues encountered in the course of the audit work, including: restrictions on the scope of activities; access to required information; the adequacy of internal controls, including any special audit steps adopted in light of any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting identified during the course of the annual audit, any fraud, whether or not material, that involves management or other employees or consultants who have a significant role in the Company's internal controls structure and procedures for financial reporting, and the adequacy of disclosures about changes in internal control over financial reporting; the adequacy of the disclosure of offbalance sheet transactions, arrangements, obligations and relationships in reports filed with the Securities and Exchange Commission (the "SEC"); and the appropriateness of the presentation of any non-GAAP financial measures (as defined in the rules and regulations promulgated by the SEC (the "Regulations")) included in any report filed with the SEC or in any public disclosure or release.

7. Review and discuss with management and the independent auditor management's report on internal control over financial reporting, and, if applicable, the independent auditor's audit of the effectiveness of the Company's internal control over financial reporting and its attestation report, if any, prior to the filing of the Company's annual report on Form 10-K.

8. Following such review and discussions, if so determined by the Committee, recommend to the Board that the annual financial statements be included in the Company's annual report on Form 10-K.

9. Meet quarterly with management and the independent auditor to discuss the quarterly financial statements prior to the filing of the Company's quarterly report on Form 10-Q; provided that this responsibility may be delegated to the chair of the Committee or a member of the Committee who is a financial expert; provided, further, that if the responsibility to meet quarterly with management and the independent auditor is delegated, the Committee itself shall still meet at least quarterly.

10. Meet at least once each year in separate executive sessions with management, the internal auditor, if any, and the independent auditor to discuss matters that any of them or the Committee believes could significantly affect the Company's financial statements and should be discussed privately.

11. Have such direct and independent interaction with members of management, including the Company's principal financial officer and principal accounting officer, as the Committee believes appropriate.

12. Review significant changes to the Company's accounting principles and practices proposed by the independent auditor, the internal auditor, if any, or management . . . .

16. Periodically review with management and evaluate any significant financial risk exposures facing the Company and the steps management has taken to control and monitor such exposures . . . .

18. Conduct or authorize such inquiries into matters within the Committee's scope of responsibility as the Committee deems appropriate.

19. Prepare the Committee report required by the Regulations to be included in the Company's proxy statement for its annual meeting of stockholders . . . .

23. Oversee the implementation and enforcement of the Company's policy regarding trading in stock and other securities of the Company and the disclosure of such transactions, including reviewing reports prepared by any compliance officer designated under such policy regarding ongoing compliance matters and disciplinary actions under such policy.

24. Provide minutes of Committee meetings to the Board, and report to the Board on any significant matters arising from the Committee's work.

## **SUBSTANTIVE ALLEGATIONS**

*Background*

50.     Savara is a clinical stage biopharmaceutical company based in Pennsylvania. Savara focuses on tackling rare respiratory diseases like aPAP, a chronic debilitating rare lung disease, with the Company's primary product candidate MOLBREEVI, an investigational inhaled biologic for aPAP. Savara seeks to "become a leader in rare respiratory therapeutics through the development and commercialization of novel, best-in-class medicines that address unmet medical needs in [its] field."

51.     MOLBREEVI is an inhaled formulation of recombinant human GM-CSF used to address aPAP, a disease which causes the buildup of surfactant in the alveoli and depletes the GM-CSF. GM-CSF is crucial for bodily health because it is an important protein in the body's immune system that helps make more white blood cells, especially granulocytes, macrophages, and cells that become platelets. Among other things, GM-CSF can help clear surfactant from the air sacs in

the lungs.

52.    In May 2019, the FDA granted a "Fast Track Designation" to MOLBREEVI for the treatment of aPAP. Fast track designations by the FDA facilitate the development, and expedite review, of new drugs or biologics intended to treat serious or life-threatening conditions, like aPAP. The fast track designation was meant to help MOLBREEVI quickly obtain the data necessary to support FDA approval through the BLA process.

53.    The BLA process includes two distinct stages: a pre-clinical stage and a clinical stage.[4] The pre-clinical development stage typically involves laboratory evaluations of a drug's chemistry, formulation, and stability in addition to evaluating its pharmacological activity and toxicity in animals, which tend to support subsequent clinical testing.[5] The clinical stage surrounding the administration of the tested product to healthy volunteers and patients under the supervision of qualified investigators.[6] Clinical trials are conducted in three sequential "Phases." Phase I trials are conducted in a small number of volunteers or people with the disease/condition— typically between 20 to 100 people—to assess how the drug interacts with the human body, the side effects associated with increased dosage, and early information about how effective it is to determine how best to administer the drug to limit risks and maximize possible benefits.[7] Phase II trials are conducted in a limited patient population afflicted with a specific disease/condition in

---

[4] *See* U.S. Food and Drug Admin., *Biologics License Applications (BLA) Process (CBER)* (Jan. 27, 2021), https://www.fda.gov/vaccines-blood-biologics/development-approval-process-cber/biologics-license-application-bla-process-cber.

[5] *Exploring the Five Phases of Drug Development*, Patheon Pharma Services (Oct. 23, 2023), https://www.patheon.com/us/en/insights-resources/blog/drug-development-phases.html.

[6] *Id.*

[7] U.S. Food and Drug Admin., *Step 3: Clinical Research* (Jan. 4, 2018), https://www.fda.gov/patients/drug-development-process/step-3-clinical-research.

order to assess the drug efficacy and side effects.[8] Phase III involves larger scale, longer duration clinical trials that are conducted on patients with a specific disease or condition to demonstrate whether or not a candidate drug offers a treatment benefit to a specific population.[9]

54.    Before, and into, the Relevant Period, Savara was conducting Phase III IMPALA-2 pivotal clinical trials on MOLBREEVI. During the clinical trial process, a company can apply for a BLA with the FDA so that the company seeking the BLA can distribute its biologic product across the United States. To be granted a BLA, the company seeking the BLA must disclose the candidate drug's CMC, including the manufacturing process, stability testing, analytic method validation, and process validation test runs. The FDA also requires further disclosures regarding a company's facilities, equipment, and quality control processes to affirm a BLA. However, before, and after, Savara submitted the BLA for MOLBREEVI to the FDA, the Company made materially false and misleading statements about, among other things, MOLBREEVI and its BLA.

***Individual Defendants' Materially False and Misleading Statements***

55.    On March 7, 2024, the Company filed its annual report for the fiscal year ended December 31, 2023, on a Form 10-K with the SEC (the "2023 10-K"). The 2023 10-K represented Savara's management's strong capabilities to advance products through regulatory processes, stating "[o]ur management team has significant experience in orphan drug development and pulmonary medicine, identifying unmet needs, and ***effectively advancing product candidates to approval and commercialization***."[10]

56.    The 2023 10-K also updated shareholders on MOLBREEVI's clinical trial, stating,

---

[8] *Id.*

[9] *Id.*

[10] All emphasis is added unless otherwise stated.

in relevant part:

> Our goal is to become a leader in rare respiratory therapeutics through the development and commercialization of novel, best-in-class medicines that address unmet medical needs in this field. Key elements of our strategy include:
>
> **Continued advancement of the molgramostim aPAP program and the Phase 3 IMPALA-2 pivotal clinical trial.** The IMPALA-2 trial design has been endorsed by regulatory authorities in the U.S. (FDA), Europe (EMA), United Kingdom Medicines and Healthcare Products Regulatory Agency ("MHRA")), and Japan (Pharmaceuticals and Medical Devices Agency ("PMDA")), and regulatory and ethics committees in various countries and sites where the trial is being conducted. The dosing of the first patient was initiated in June 2021. During the second quarter of 2023, patient enrollment in the trial was completed (target enrollment was 160, the trial enrolled 164 patients) with top line results expected to be reported at the end of the second quarter of 2024.[11]

57.    In the 2023 10-K, the Company also discussed the "key advantages" of MOLBREEVI stating, in relevant part:

> Based on data from the completed Phase 2/3 IMPALA trial and building upon the published investigator-sponsored treatment experience with inhaled GM-CSF, we believe molgramostim has the potential to become the treatment of choice for aPAP. The following characteristics of molgramostim may contribute to the clinical profile of the investigational product candidate, as well as facilitate potential regulatory approval and successful commercialization.
>
> Specifically, molgramostim offers:
>
> - a strong product foundation that applies both a previously approved active drug substance class and drug delivery technology;
> - GM-CSF delivered directly to the lungs, the primary site of macrophage function deficiency in aPAP, which could result in clinical efficacy with limited systemic adverse effects;
> - a nebulizer system that provides a fast and convenient method of administration; this is highly desirable for long-term treatment in a chronic disease, such as aPAP;
> - a low patient impact therapy that can be carried out in the home in 3 to 5 minutes each day using the portable eFlow Nebulizer System;
> - eligibility for strong market protection via orphan drug status, potential eligibility for biologic exclusivity that provides twelve years of total market protection in the U.S.;
> - a proprietary cell bank used in the production of the drug substance; and

---

[11] Emphasis in original.

- an exclusive agreement for the specific device that is optimized for administration of molgramostim.

58.     The 2023 10-K was signed by Defendants Pauls, Lowrance, Ramsay, McCracken, Elam, Hawkins, and van Es-Johansson. Attached to the 2023 10-K were certifications made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Pauls and Lowrance, certifying that the 2023 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [2023 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

59.     On the same day, the Company issued a press release reporting its financial results for fiscal year 2023 (the "2023 Press Release"). The 2023 Press Release discussed the financing of the Company, the Phase III trials of MOLBREEVI, and the Company's "strong fiscal discipline" stating, in relevant part:

> We look forward to reporting IMPALA-2 top line results at the end of the second quarter and, assuming positive data, anticipate filing the BLA in the first half of 2025," said [Defendant] Pauls[.] "2023 was a year of strong execution that included the on-time, over-enrollment of the Phase 3 IMPALA-2 trial and an analysis of a health claims database that identified ~3,600 currently diagnosed aPAP patients and another ~1,400 potential, currently undiagnosed, aPAP patients in the U.S. Additionally, we launched aPAP ClearPathTM, a simple, accurate, no-cost, labdeveloped GM-CSF autoantibody blood test, along with a disease state awareness campaign, that is educating U.S. pulmonologists about the disease and need for earlier testing. ***Finally, we completed an $80 million equity financing last July, and with $162 million in cash and investments and a track record of strong fiscal discipline, we believe we are capitalized into 2026***.

60.     On April 26, 2024, the Company filed a proxy statement on a Schedule 14A with the SEC (the "2024 Proxy"). The 2024 Proxy sought, among other things, (1) the re-election of Defendants Pauls, Elam, Hawkins, McCracken, Ramsay, and van Es-Johansson; (2) approval of an amendment to the Company's Amended and Restated Certificate of Incorporation to allow for the exculpation of certain of the Company's officers as permitted by Delaware law; (3) approval,

on an advisory basis, of the compensation for the Company's named executives; and (4) approval

for the 2024 Omnibus Incentive Plan, which would become effective immediately if shareholders

voted for its approval.

61.    The 2024 Omnibus Incentive Plan was to replace the Company's pre-existing

incentive plan, which was set to expire in 2024. The 2024 Proxy stated that the approval of the

2024 Omnibus Incentive Plan will cause an additional 11,700,000 shares of common stock to be

made available under the 2024 Omnibus Incentive Plan for issuance. Per the 2024 Proxy, as of

April 8, 2024, there were 987,502 shares still available for grant under the prior plan, meaning that

if the 2024 Omnibus Incentive Plan is approved, there would be a total of 12,687,502 available for

grant. The 2024 Proxy states that consultants, officers, advisors, non-employee directors, and

eligible employees are available to participate in the 2024 Omnibus Incentive Plan, and that if the

2024 Omnibus Incentive Plan was not approved, the Company will not be able to grant further

equity or equity-based compensation when the pre-existing plan expires in 2025. The 2024 Proxy

notes that "the effective use of stock-based long-term incentive compensation is essential for our

company to maintain a balanced and competitive compensation program and important to our

ability to achieve long-term business objectives."

62.    Additionally, the 2024 Proxy assured shareholders that the Company's Board was

effectively overseeing risks to the Company stating, in relevant part:

> Our Board of Directors is responsible for oversight of risks facing our company,
> while our management is responsible for day-to-day management of risk. Our
> Board of Directors, as a whole, directly administers its risk oversight function. In
> addition, the risk oversight function is also administered through the committees of
> our Board of Directors, which oversee risks inherent in their respective areas of
> responsibility, report to our Board of Directors regularly and involve the Board as
> necessary. For example, the Audit Committee oversees our financial exposure and
> financial reporting related risks, and the Compensation Committee reviews risks
> related to our compensation programs and practices and both such committees
> make recommendations to our Board regarding oversight of such risks. Our Board

24

of Directors, as a whole, directly oversees our strategic and business risk, including product development risk and business continuity risk, through regular interactions with our management. We believe our Board's leadership structure supports its role in risk oversight, with our executive officers responsible for assessing and managing risks facing our company on a day-to-day basis and the members of our Board of Directors providing oversight of such risk management.

63.    The 2024 Proxy also discussed the requirements of employees, management, and directors to adhere to ethics and the Code of Conduct stating, in relevant part:

We are committed to acting with integrity in every aspect of our business. We have adopted a Code of Conduct and require all employees to complete training on it. Additionally, we have established a toll-free hotline and web-based service to enable anonymous reporting of concerns regarding ethical issues or suspected violations of our policies. In 2023, no reports were submitted.

64.    The 2024 Proxy also discussed the responsibilities and duties of the Company's Audit Committee stating, in relevant part:

[T]he Audit Committee performs several functions, including, among other things . . . .

- reviewing and discussing, including with management and the independent auditor, the annual and quarterly financial statements;
- reviewing any proposed significant changes to accounting principles and practices;
- reviewing any material changes to the system of internal control over financial reporting;
- reviewing management's report on effectiveness of internal control over financial reporting and the independent auditor's audit of the effectiveness of Savara's internal control over financial reporting, if applicable . . .
- overseeing the implementation and enforcement of our insider trading policy;
- reviewing and evaluating any significant financial risk exposures facing Savara and the steps our management has taken to control and monitor such exposures;

65.    On May 9, 2024, the Company issued a press release reporting its financial results for the first quarter of fiscal year 2024 (the "1Q24 Press Release"). The 1Q24 Press Release discussed the ongoing Phase III trials of MOLBREEVI stating, in relevant part:

***The IMPALA-2 trial remains on-track and we look forward to reporting top line results by the end of the second quarter,"*** said [Defendant] Pauls[.] ***"Following that, and assuming positive data, we expect to file a BLA in the first half of 2025.***

Importantly, with $143 million in cash and investments, *we believe we are capitalized into 2026* which is well beyond the data read-out and includes investments in programs such as the extension of the IMPALA-2 open-label period from 48 weeks to 96 weeks, anticipated launch of a global Expanded Access program for molgramostim, build out of the U.S. Commercial infrastructure, and pre-Commercial preparations in Europe.

66.     On August 12, 2024, the Company issued a press release reporting its financial results for the second quarter of fiscal year 2024 (the "2Q24 Press Release"). The 2Q24 Press Release represented to shareholders that the Company had sufficient capital to last throughout 2026 stating, in relevant part, "[i]n July 2024, further strengthened balance sheet with an ~$100M equity financing, which added ~$94M to the ~$122M in cash, cash equivalents, and short-term investments reported as of June 30, 2024; *Company expects to be sufficiently capitalized through 2026.*"

67.     The 2Q24 Press Release quoted Defendant Puals who touted the success of MOLBREEVI, stating, in relevant part:

> *Following strong top line results in the IMPALA-2 trial, we plan to complete the BLA submission for MOLBREEVI, the trade name that the FDA has conditionally accepted for molgramostim, in the first half of 2025* . . . [i]n parallel, we are now significantly ramping up global market development activities and look forward to presenting this work, as well as data from the IMPALA-2 trial, during our investor webinar in September . . . . *The IMPALA-2 data support our view that MOLBREEVI could fundamentally change the way aPAP is treated*. With approximately 3,600 currently diagnosed U.S. patients and literature suggesting prevalence may be underestimated, plus our increased focus on developing the aPAP market and the potential for MOLBREEVI to be the first and only approved therapy for aPAP in the U.S. and Europe, *we believe the global commercial opportunity is significant*.

68.     On September 27, 2024, the Company issued a press release wherein the Company represented that it expected to complete the BLA for MOLBREEVI in the first half of 2024, stating, in relevant part:

> Expanded access is granted to investigational products that address a serious condition for which there are no comparable therapies available," said [Defendant]

Pauls[.] "Given the high unmet need in aPAP, and positive results demonstrated in the Phase 3 IMPALA-2 clinical trial, we felt it was critically important to establish the Savara Early Access Program to allow eligible aPAP patients pre-approval access to molgramostim. ***This program reflects our ongoing commitment to the global aPAP community and the goal of potentially delivering an effective therapy for patients with this rare lung disease as quickly as possible***.

***Savara plans to complete submission of a Biologics License Application to the FDA for molgramostim in aPAP in the first half of 2025***. Molgramostim has been granted Orphan Drug, Fast Track, and Breakthrough Therapy designations from the FDA, Orphan Drug designation from the European Medicines Agency and Innovative Passport and Promising Innovative Medicine designation from the UK's Medicines and Healthcare Products Regulatory Agency for the treatment of aPAP.[12]

69.     On November 12, 2024, the Company issued a press release reporting its financial results for the third quarter of fiscal year 2024 (the "3Q24 Press Release"). The 3Q24 Press Release updated shareholders on the status of the BLA for MOLBREEVI, assuring them that the Company was well capitalized through the second quarter of 2027, stating, in relevant part:

***After a productive pre-BLA meeting with the FDA, we are working diligently to initiate a rolling submission for MOLBREEVI by the end of this year, with plans to complete the BLA submission by the end of 1Q 2025—thus enabling a potential approval in the U.S. by the end of 2025, if priority review is granted***," said [Defendant] Pauls[.] "***BLA submission, coupled with the submission of the MAA to the EMA by the end of 2025, are major regulatory milestones that could bring us one step closer to providing aPAP patients in the U.S. and Europe with the first and only approved therapeutic option for this rare and debilitating lung disease***. In parallel, we are accelerating the build-out of our commercial capabilities, complimented by ongoing market development initiatives, to ensure the approximately 3,600 diagnosed aPAP patients in the U.S. get access to MOLBREEVI post-approval. ***Lastly, after strengthening our balance sheet, we believe our cash runway now extends from the end of 2026 through the second quarter of 2027***.

---

[12] Press Release, Savara Inc., Savara Announced Expanded Access Program (EAP) for Molgramostim Inhalation Solution (Molgramostim) for Patients with Autoimmune Pulmonary Alveolar Proteinosis (aPAP) (Sept. 27, 2024), https://investors.savarapharma.com/news/news-details/2024/Savara-Announces-Expanded-Access-Program-EAP-for-Molgramostim-Inhalation-Solution-Molgramostim-for-Patients-with-Autoimmune-Pulmonary-Alveolar-Proteinosis-aPAP-09-27-2024/default.aspx.

70.    On December 18, 2024, the Company issued the BLA Press Release. In the BLA

Press Release, Savara announced it had begun the BLA process, quoting Defendant Pauls who

stated, in relevant part:

> *Given the positive results of the pivotal, Phase 3 IMPALA-2 trial, we believe*
> *MOLBREEVI demonstrates a favorable benefit-risk profile and could*
> *fundamentally change the way aPAP is treated . . . . Initiation of the BLA is an*
> *important milestone in potentially addressing the unmet need in aPAP, for which*
> *there are no approved medicines in the U.S. and Europe. We look forward to*
> *working closely with the FDA throughout the review process and expect to*
> *complete the submission of the rolling BLA by the end of 1Q 2025.*

71.    On March 6, 2025, the Company issued a press release announcing that the BLA

for MOLBREEVI was nearly complete stating, in relevant part, "*[a]s we near the completion of*

*our rolling BLA submission for MOLBREEVI™ in aPAP*, which is on track for the end of 1Q

2025, we are steadfastly committed to our goal of providing the aPAP community with the first

and only approved treatment option in the U.S."[13]

72.    On March 26, 2025, the Company issued another press release indicating it had

completed its submission of the BLA for MOLBREEVI, which quoted Defendant Pauls who

indicated the Company was on track for a launch of MOLBREEVI in early 2026, stating, in

relevant part:

> *Submission of the BLA marks an important milestone for the Company and the*
> *aPAP community . . . . We believe this unprecedented body of data demonstrates*
> *MOLBREEVI improves pulmonary gas exchange and the clinical symptoms*
> *associated with this rare lung disease. As part of the submission, Priority Review*
> *was requested and, if granted, would shorten the FDA's review to six months*
> *(from the standard ten months) following the Agency's acceptance of the*
> *application*. We look forward to continuing our dialogue with the FDA and extend
> our gratitude to the patients and physicians who participated in our clinical trials.

---

[13] Press Release, Savara Inc., Savara Announced U.S. Launce of the aPAP ClearPath™ Dried
Blood Spot Test to Detect Autoimmune Pulmonary Alveolar Proteinosis (aPAP) (Mar. 6, 2025),
https://investors.savarapharma.com/news/news-details/2025/Savara-Announces-U-S--Launch-of-
the-aPAP-ClearPath-Dried-Blood-Spot-Test-to-Detect-Autoimmune-Pulmonary-Alveolar-
Proteinosis-aPAP-03-06-2025/default.aspx.

*Our commercial preparations are on-track to support a potential launch in early 2026.*[14]

73.    On March 27, 2025, the Company issued a press release reporting its fourth quarter and full year financial results for fiscal year 2024 (the "4Q24 Press Release"). In the 4Q24 Press Release, the Company again touted its capitalization and prospective launch of MOLBREEVI in early 2026, quoting Defendant Pauls who stated, in relevant part:

> *Completing submission of the BLA is an important milestone in potentially addressing the significant unmet need of people living with aPAP, a rare and debilitating lung disease . . . . MOLBREEVI has the potential to be the first and only approved therapy for aPAP in the U.S. and Europe and could redefine the standard of care for the disease. If granted Priority Review, we could have a PDUFA date by the end of the year and are preparing for a commercial launch in early 2026.* Lastly, with approximately $196 million in cash, *we are in a strong financial position and believe our cash runway extends through 2Q 2027*, excluding our recent debt financing which adds additional low-cost capital options to further finance the Company.

74.    On the same day, the Company filed its annual report for the fiscal year ended December 31, 2024, on a Form 10-K with the SEC (the "2024 10-K"). The 2024 10-K made the same representations of the Company's management capabilities, corporate strategy, and MOLBREEVI's "key advantages" as discussed above, *supra* ¶¶ 55–57.

75.    The 2024 10-K was signed by Defendants Pauls, Lowrance, Ramsay, McCracken, Elam, Hawkins, and van Es-Johansson. Attached to the 2024 10-K were certifications made pursuant to SOX, signed by Defendants Pauls and Lowrance, certifying that the 2023 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the

---

[14] Press Release, Savara Inc., Savara Completed Submission of the Biologics License Application (BLA) to the U.S. Food and Drug Administration (FDA) for MOLBVREEVI* as a Treatment for Autoimmune Pulmonary Alveolar Proteinosis (aPAP) (Mar. 26, 2025), https://investors.savarapharma.com/news/news-details/2025/Savara-Completes-Submission-of-the-Biologics-License-Application-BLA-to-the-U-S--Food-and-Drug-Administration-FDA-for-MOLBREEVI-as-a-Treatment-for-Autoimmune-Pulmonary-Alveolar-Proteinosis-aPAP/default.aspx.

"information contained in the [2024 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

76.    On May 13, 2025, the Company issued the 1Q25 Press Release. The 1Q25 Press Release continued to represent the Company's capitalization through the second half of 2027 and potential launch of MOLBREEVI in early 2026, quoting Defendant Pauls who stated, in relevant part:

> *At the end of 1Q 2025, we announced the on-time submission of the MOLBREEVI BLA to the FDA for the treatment of autoimmune PAP and requested priority review* . . . . *If Priority Review is granted, we anticipate a PDUFA date by the end of the year and are preparing for a U.S. commercial launch in early 2026*. We are also on track to submit the MAA in both Europe and the U.K. by the end of the year. Lastly, with approximately $172.5 million in cash, and the optionality to further finance the company through access to low-cost capital from our recent debt financing, we are in a strong financial position and *believe our current cash runway extends into 2H 2027, well beyond a U.S. launch*.

77.    The above statements in ¶¶ 55–59, 61–76 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) the BLA for MOLBREEVI lacked the necessary CMC information to complete the BLA; (ii) as a result of the incomplete CMC information, the FDA was unlikely to approve the BLA for MOLBREEVI; (iii) the timeframe in which the Individual Defendants represented to shareholders that the BLA for MOLBREEVI would be approved was unrealistic; (iv) due to the delay in the approval of the BLA for MOLBREEVI, there was an increased likelihood that the Company would need to raise additional capital; (v) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval for agendas in the 2024 Proxy, including, but not limited to, the 2024 Omnibus Incentive Plan; (vi) the Company did not have effective risk oversight mechanisms and controls in place; and (vii) as a result of the

foregoing, the Company's public statements regarding its business, operations, and financial

prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth is Revealed***

78. The truth was revealed on May 27, 2025, when the Company issued the RTF Pres

Release. The RTF Press Release revealed that the FDA had issued an RTF to Savar because of the

lacking information related to MOLBREEVI's CMC required in the BLA. The Company stated,

in relevant part:

> Savara Inc. . . . today announced that the Company received an RTF letter from the
> FDA for the BLA of MOLBREEVI as a therapy to treat patients with autoimmune
> PAP.
>
> ***Upon preliminary review, the FDA determined that the BLA submitted in March
> 2025 was not sufficiently complete to permit substantive review and requested
> additional data related to Chemistry, Manufacturing, and Controls (CMC).*** The
> RTF was not the result of safety concerns, and the FDA did not request or
> recommend additional efficacy studies. Within the next 30 days, the Company
> intends to request a Type A meeting with the Agency. Typically, Type A meetings
> are granted by the FDA within 30 days of the request.[15]

79. Market analysts reacted negatively to the RTF Press Release, with Guggenheim

publishing a lower price target for Savara on May 27, 2025, and noting the implications of the

RTF stating, in relevant part:

> While Molbreevi is currently manufactured by GEMA (Private), as part of a
> strategy to ensure sufficient commercial product supply and build in manufacturing
> redundancy, Savara had already entered into an agreement back in Feb. 2024 with
> Fujifilm Diosynth Biotechnologies (Fujifilm; 4901-JP) to become their second
> source manufacturer. The company remains on track to complete the
> technologytransfer with Fujifilm in 3Q 2025, which will now be before their
> anticipated 4Q 2025 resubmission of the BLA. Management informed us that
> Fujifilm is already collecting the in-process testing data that the FDA is currently
> requesting, meaning that although SVRA could continue with their previous plan
> of filing a postapproval supplement for Fujifilm to serve as their second source
> manufacturer, they now potentially have additional optionality around which
> company will serve as the primary Molbreevi manufacturer. While a final decision

---

[15] RTF Press Release, *supra* note 3.

cannot be made until the conclusion of their Type A meeting with the FDA, the company stated that their choice will be driven by which option provides them with the higher probability of regulatory success in the shortest time-frame. ***Given the RTF letter, we are lowering our POS for Molbreevi obtaining FDA approval*** . . . .

Savara finished 1Q 2025 with ~$172.5M in cash and cash equivalents on hand, with management continuing to believe they have sufficient capital to fund operations into 2H 2027. ***We do not expect Savara to be profitable on a continuing basis until 2028 and expect the company may raise additional capital, potentially through a secondary stock offering that could dilute the holdings of current investors. In addition, any delays in obtaining regulatory approval, bringing their drug to the market, challenges in obtaining proper reimbursement for the products, or poor commercial execution by Savara could lead to lower sales and market share, significantly impacting the company's valuation***.

80.     On this news, the Company's stock price declined $0.90 per share, or approximately 31.7%, from a close at $2.84 per share on May 23, 2025, to close at $1.94 per share on May 27, 2025, on high trading volume.

***Insider Sales***

81.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendants Pauls, Lowrance, and Hawkins sold substantial portions of Company stock while in possession of non-public information concerning the Company's financial condition and business prospects.

82.     According to the Company's public filings, while the Company's stock price was artificially inflated, Defendant Pauls sold approximately 147,295 shares of Savara common stock, totaling proceeds of approximately $478,052. Pauls made the following sale of Savara stock around the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| Dec. 13, 2024 | 92,593 | $3.21 | $297,224 |
| Dec. 16, 2024 | 54,702 | $3.31 | $180,828 |

83.     According to the Company's public filings, while the Company's stock price was

artificially inflated, Defendant Lowrance sold approximately 49,350 shares of Savara common stock, totaling proceeds of approximately $161,441.Lowrance made the following sale of Savara stock around the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| Dec. 13, 2024 | 24,350 | $3.21 | $78,164 |
| Dec. 16, 2024 | 25,000 | $3.31 | $83,278 |

84.    According to the Company's public filings, while the Company's stock price was artificially inflated, Defendant Hawkins sold approximately 8,000 shares of Savara common stock, totaling proceeds of approximately $26,569. Hawkins made the following sale of Savara stock around the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| Dec. 16, 2024 | 8,000 | $3.32 | $26,569 |

85.    In total, during the Relevant Period, these three Individual Defendants' lucrative insider sales netted proceeds of over $600,000.

86.    As a result of these insider sales, Defendants Pauls, Lowrance, and Hawkins were unjustly enriched.

**Harm to the Company**

87.    As a direct and proximate result of the Individual Defendants' misconduct, Savara has lost and expended, and will lose and expend, millions of dollars.

88.    Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Pauls and Lowrance, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

89.    Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

90.    Such expenditures also include improperly increasing material personal benefits to interested Individual Defendants because of the 2024 Omnibus Incentive Plan, which Individual Defendants would not have otherwise received but for the issuance of the materially false and misleading 2024 Proxy, which solicited shareholders votes on the 2024 Omnibus Incentive Plan.

91.    As a direct and proximate result of the Individual Defendants' conduct, Savara has also suffered, and will continue to suffer, a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock into the future due to the Company's and the Individual Defendants' misrepresentations and the Individual Defendants' misconduct.

92.    Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

93.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

94.    Plaintiff will adequately and fairly represent the interests of Savara and its shareholders in enforcing and prosecuting its rights.

95.    Savara is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

96.    Plaintiff is a current shareholder of Savara and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights

and retained counsel competent and experienced in derivative litigation.

97.    A pre-suit demand on the Board of Savara is futile and, therefore, excused.  At the time this action was commenced, the six-person Board consisted of Individual Defendants Pauls, Elam, Hawkins, McCracken, Ramsay, and van Es-Johansson (the "Director Defendants"). Accordingly, Plaintiff is only required to show that three Director Defendants cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

98.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

99.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

100.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

101.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims.  Specifically, as Board members of Savara, the Director Defendants knew, or should have known, the material facts surrounding Savara's financial condition and internal control mechanisms.

102.    Defendant Pauls is not disinterested or independent. In addition to being a director, Defendant Pauls serves as the CEO of the Company. Thus, as stated in the 2025 Proxy, the Company admits that Defendant Pauls is a non-independent director. Defendant Pauls also has received, and continues to receive, substantial revenue from the Company, he helps control the Company, he is indebted to the other Director Defendants, and he has not taken remedial actions to redress the conduct alleged herein. Furthermore, Defendant Pauls is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

103.    Demand on Defendant Elam is futile because Elam has received, and continues to receive, substantial revenue from the Company, he helps control the Company, he is indebted to the other Director Defendants, and he has not taken remedial actions to redress the conduct alleged herein. Defendant Elam has also signed certain of the above-detailed materially false and misleading filings with the SEC, including the 2023 10-K and 2024 10-K. Additionally, Defendant Elam has solicited the 2024 Proxy, which contained material misrepresentations and omissions.

104.    Demand on Defendant Hawkins is futile because Hawkins has received, and continues to receive, substantial revenue from the Company, he helps control the Company, he is

indebted to the other Director Defendants, and he has not taken remedial actions to redress the conduct alleged herein. Defendant Hawkins has also signed certain of the above-detailed materially false and misleading filings with the SEC, including the 2023 10-K and 2024 10-K. Additionally, Defendant Hawkins has solicited the 2024 Proxy, which contained material misrepresentations and omissions.

105.    Demand on Defendant McCracken is futile because McCracken has received, and continues to receive, substantial revenue from the Company, he helps control the Company, he is indebted to the other Director Defendants, and he has not taken remedial actions to redress the conduct alleged herein. Defendant McCracken has also signed certain of the above-detailed materially false and misleading filings with the SEC, including the 2023 10-K and 2024 10-K. Additionally, Defendant McCracken has solicited the 2024 Proxy, which contained material misrepresentations and omissions.

106.    Demand on Defendant Ramsay is futile because Ramsay has received, and continues to receive, substantial revenue from the Company, he helps control the Company, he is indebted to the other Director Defendants, and he has not taken remedial actions to redress the conduct alleged herein. Defendant Ramsay has also signed certain of the above-detailed materially false and misleading filings with the SEC including the 2023 10-K and 2024 10-K. Additionally, Defendant Ramsay has solicited the 2024 Proxy, which contained material misrepresentations and omissions.

107.    Demand on Defendant van Es-Johansson is futile because van Es-Johansson has received, and continues to receive, substantial revenue from the Company, she helps control the Company, she is indebted to the other Director Defendants, and she has not taken remedial actions to redress the conduct alleged herein. Defendant van Es-Johansson has also signed certain of the

above-detailed materially false and misleading filings with the SEC,, including the 2023 10-K and 2024 10-K. Additionally, Defendant van Es-Johansson has solicited the 2024 Proxy, which contained material misrepresentations and omissions.

108.    Accordingly, all of the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus, demand upon them is futile, and therefore excused.

109.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

110.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.  As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

111.    Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

112.    Defendants Hawkins, Ramsay, and van Es-Johansson (the "Audit Defendants") as serve on the Company's Audit Committee, and pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting.  At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board

of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

113.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

114.    Accordingly, a pre-suit demand on the Board is futile and excused.

## COUNT I
### Against the Individual Defendants for Violations of Section 14(a)
### of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R.§240.14a-9)

115.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116.    The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

117.    Section 14(a) of the Exchange Act provides that:

It shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security)

registered pursuant to section 12 of this title [15 U.S.C. § 78l].

15 U.S.C. § 78n(a).

118.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

119.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy, which was filed with the SEC. As alleged above, the 2024 Proxy was materially false and misleading because it failed to disclose, *inter alia*, that the Board and management were not properly overseeing risks to the Company, namely risks related to the creation and submission of the BLA for FDA approval of MOLBREEVI.

120.    The misrepresentations and omissions in the 2024 Proxy were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2024 Proxy, including, but not limited to, the reelection of certain of the Individual Defendants to the Board; the approval of an amendment to the Company's Amended and Restated Certification of Incorporation to allow for the exculpation of certain officers of the Company as permitted by Delaware law; the approval, on an advisory basis, of the compensation for the Company's named executives; and the 2024 Omnibus Incentive Plan .

121.    The materially false and misleading statements contained in the 2024 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Puals, Elam, Hawkins,

McCracken, Ramsay, and van Es-Johansson to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

122.    The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the 2024 Proxy.

123.    As a result of the Individual Defendants' material misrepresentations and omissions, the Company has sustained significant damages.

124.    Plaintiff, on behalf of Savara, has no adequate remedy at law.

### COUNT II
### Against the Individual Defendants
### For Breach of Fiduciary Duty

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

127.    Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

128.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and

deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

129.    Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) the BLA for MOLBREEVI lacked the necessary CMC information to complete the BLA; (ii) as a result of the incomplete CMC information, the FDA was unlikely to approve the BLA for MOLBREEVI; (iii) the timeframe in which the Individual Defendants represented to shareholders that the BLA for MOLBREEVI would be approved was unrealistic; (iv) due to the delay in the approval of the BLA for MOLBREEVI, there was an increased likelihood that the Company would need to raise additional capital; (v) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval for agendas in the 2024 Proxy, including, but not limited to, the 2024 Omnibus Incentive Plan; (vi) the Company did not have effective risk oversight mechanisms and controls in place; and (vii) as a result of the foregoing, the Company's public statements regarding its business, operations, and financial prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

130.    The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

131.    In further breach of their fiduciary duties, the Individual Defendants failed to

correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

132.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

133.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

134.    Plaintiff, on behalf of Savara, has no adequate remedy at law.

<u>**COUNT III**</u>
**Against the Individual Defendants for Aiding and**
**Abetting Breach of Fiduciary Duty**

135.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

136.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

137.    Plaintiff on behalf of Savara has no adequate remedy at law.

<u>**COUNT IV**</u>
**Against the Individual Defendants for Unjust Enrichment**

138.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

139.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Savara.

140.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Savara that was tied to the performance or artificially inflated valuation of Savara, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

141.    Plaintiff, as a shareholder and a representative of Savara, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

142.    Plaintiff on behalf of Savara has no adequate remedy at law.

<u>**COUNT V**</u>
**Against the Individual Defendants for Waste of Corporate Assets**

143.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

144.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

145.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses, and

(ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

146.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

147.    Plaintiff, on behalf Savara, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Directing Savara to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders form a repeat of the damaging events described herein;

D.    Awarding punitive damages;

E.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.


DATED: January 16, 2026

**RIGRODSKY LAW, P.A.**

By: _/s/ Gina M. Serra_

Gina M. Serra

**OF COUNSEL:**                                                       1007 North Orange Street, Suite 453

Wilmington, DE 19801

**RIGRODSKY LAW, P.A.**                                   Telephone: (302) 295-5310

Seth D. Rigrodsky                                                 Facsimile: (302) 654-7530

Vincent A. Licata                                                  Email: gms@rl-legal.com

Leah B. Wihtelin

825 East Gate Boulevard, Suite 300                    _Attorneys for Plaintiff_

Telephone: (516) 683-3516

Email: sdr@rl-legal.com

Email: vl@rl-legal.com

Email: lw@rl-legal.com


**GRABAR LAW OFFICE**

Joshua H. Grabar

1650 Market Street, Suite 3600

Philadelphia, PA 19103

Telephone: (267) 507-6085

Email: jgrabar@grabarlaw.com